## ARTHUR M. HERITAGE *v.* KATHERINE C. HERITAGE.

## No. 1800.

ARGUED DECEMBER 18, 1928. DECIDED FEBRUARY 7, 1929.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF BANKS, J.

This case comes here on writ of error. The suit was brought by the husband for a divorce on the ground of desertion for more than six months. The libelant is a major in the United States Army and for more than two years before instituting the suit had lived continuously in Honolulu, not on a military reservation but in private residences and at a hotel.

The libelee claims that because the libelant is a member of the military forces of the United States he could not acquire such a residence in this jurisdiction as would entitle him to maintain the present action. For reasons that will presently appear we think it unnecessary to decide this question.

It appears from the evidence that the parties had lived separate and apart for several years. Referring to this separation and its causes the circuit judge in his decision said: "Wide latitude was allowed by the court in the taking of testimony. Evidence was admitted beginning with the date of marriage. Many letters were received in evidence on behalf of the libelee showing the condition and circumstances of the home life, the attitude of each to the other, and various and sundry incidents of the marriage relation. It appears from the evidence that the libelant was on more than one occasion desirous of securing a divorce and so stated in letters to the libelee. He also entered into an agreement duly witnessed that desiring to live a single life, he was willing to pay to the libelant a certain sum monthly. Many of these letters were written four or five years prior to 1922. The letters and incidents of the period preceding 1922, show that

the marriage relation was somewhat strained. Whatever may have been the causes for living separate and apart, and it is evident from the record that neither was desirous of resuming marital relations, yet it cannot be held that this situation is controlling when considered in the light of the incidents beginning with April 1922." I think it is clear from this language that the circuit judge intended to find and did find from the evidence that prior to April 1922 the separation of the parties was by mutual consent. Included in the evidence upon which this finding was based is the following communication dated January 7, 1920, addressed to the libelee and signed by the libelant:

"Jan. 7, 1920.

"To Mrs. K. C. Heritage,

"Due to the fact that I desire to live alone and apart from you I am willing to send you a check of one hundred and fifty dollars each month and as my salary increases I will also increase yours.

"A. M. Heritage

"Witness:

"B. B. Gill

"B. D. McGhee"

The evidence discloses that this communication was prepared in Washington, D. C., in the presence of the libelee and was delivered to her in person by the libelant. It is claimed by the libelant that it was dictated in his office by the libelee under circumstances that would have made it embarrassing for him to fully discuss it or object to signing it. However this may be, the libelant subsequently wrote to the libelee, saying to her in substance that she must realize that he would never return to her —that he desired his freedom, and asking her permission for him to consider obtaining a divorce. In this letter he also said: "We both have been at fault. I admit my own errors and the difficulties you may have had through them." On July 15, 1921, he wrote the libelee another

letter in which he complained that he had had no reply to his previous letter, and said that she surely would not have him believe from her silence that she did not agree with his proposal. On July 21, she wrote him: "You remind me so much of a little boy that is always crying for the moon. Be satisfied with things as they now are." But he was not satisfied, he wanted a divorce and so in August he wrote: "I have asked you to do a decent common-sense act and you have replied, 'Be satisfied with things as they now are.' This cannot be and I will not be satisfied until I do get my freedom. * * * I should think that you, an educated and well-read woman, would just hate to feel you were married to a person who does not care enough for you to want to live with you. * * * I mean absolutely nothing to you and you mean less to me so please release me like a good girl that you are and also please do not thank me any more for my checks as you know very well I only send them through a sense of duty." Later he wrote: "I have written you several times asking for my freedom and you have evidently not seen fit to grant me my one great desire. I cannot understand this for I should think you would be glad to get free of me knowing I do not love you. Will you kindly let me know what inducement I can offer you for an absolute divorce as I do not want to spend the balance of my life married to one for whom I do not care?" It is evident from these letters that neither of the parties wished during the period in which they were written to live together as husband and wife. It is equally evident that the libelant at that time had no ground for divorce. His effort was to induce the libelee to consent for him to obtain the divorce. In this he failed.

The situation remained unchanged until April 10, 1922. On that date the libelant wrote the following letter to the libelee:

"After deep and long study, I have arrived at the conclusion that we both have made a great mistake. Husband and wife should live as one and to continue to live apart as we are doing imposes hardships upon both of us.

"It might be true that absence makes the heart grow fonder, but no matter, Katherine, I want to establish a home again for ourselves. I want you to return to me and live with me as husband and wife should. Let us forget the past and live for the future alone. We have both made errors and have been hasty. I am willing to admit my mistakes and if you will do likewise, let us start life anew.

"Had suitable quarters been obtainable heretofore, I would have asked you to return before this. The quarters I have in mind will be ready for us by May 1st.

"Do you think it better to ship the furniture down by truck or railroad?

"Use your own judgment. Personally I believe that a truck will be best. Let me know when I may expect you."

On April 11, the day following the libelant's letter, the libelee replied in substance that she was willing to live with the libelant provided she was "treated as a good wife should be," and asking about the quarters in which they were to live. On April 14 the libelant wrote that he had been temporarily ordered away and would not return to the arsenal for a couple of weeks and for the libelee to arrange to have the furniture shipped so it would arrive by May 1, on which date the quarters would be ready for her. He did not inform the libelee to what place he had been ordered. He went to Panama, taking the transport at New York where the libelee was living. When he reached New York he made no effort to see her nor did he communicate with her in any way. In fact she heard nothing further from him until he returned from Panama, which was on May 20, 1922,—twenty days after the time he had written her he would return and the quarters would be ready for their occupancy. In the meantime, on April 18, the libelee wrote acknowledging

receipt of the libelant's letter of April 14 and requesting
further details as to the shipment of the furniture and
also requesting a photograph of the building where the
quarters which they were to occupy on May 1 were located.
She also requested that she be informed when the libelant
expected to return and when he expected her to come.
Owing to the libelant's absence this letter was not re-
ceived until May 20. On that date he wrote that he had
just returned and found libelee's letter. He made some
suggestions regarding the shipment of the furniture and
then said: "After the furniture is shipped it would be
best for you to stay at a hotel for a few days until it
arrives and I will wire you that you can come down and
arrange the placing of our furniture to suit you. I am
sending you a check to cover the necessary expenses in
shipping the furniture." On June 21 the libelee ac-
knowledged the receipt of this letter and said: "It has
taken me considerable time to recover from the shock
produced by its receipt." She further said: "I cannot
understand why I should be asked to remove the furni-
ture from my home, ship it to Maryland, go to a hotel and
then await word from you, particularly in view of the
fact that some time ago, after you requested that I should
come to Edgewood, you subsequently stated that you had
been ordered away and requested me not to come." She
also said: "I am very much embarrassed because I have
not received from you the monthly payments agreed upon
and fixed at your own suggestion and I do not think that
I should be left in the embarrassing position which results
from your failure to support me. I have suffered very
much from your neglect and treatment of me for a long
time past and have tried to keep to myself the sorrow
caused thereby. How much longer I can suffer in silence
I do not know. I trust that you will recognize my position
and on receipt of this letter send me a check or post office

money order for the payments due me, now aggregating the sum of $525.00." To this the libelant replied under date of July 8, 1922: "You have never said what your obligations to the landlord consisted of. I think I wrote you that I was only ordered away temporarily and would return in a couple of weeks and as soon as I returned I wrote you and told you to send the furniture by freight. I think it was clear enough that I would be away from Edgewood only a very short time. It is now entirely up to you, the home is waiting. If you prefer taking other action go ahead as I have done all I could."

The libelee then took the matter up with the military authorities, which resulted in some further correspondence which it is unnecessary to consider. On November 21, 1922, the libelee wrote the libelant the following letter:

"I received your letter today and you will see that I am in Baltimore. I came a week ago today. I have been unable to work on account of illness for the past number of months and indications are that the condition of my health will prevent me from working for a long time and that is the reason I have accepted Frank's offer to come and live with him.

"Since coming here I have been thinking things over and have decided that I would like to come and live with you at Edgewood. I have written the people where our furniture is stored to deliver it to you and hope that you will soon be able to obtain quarters for us and have the furniture moved there. After all there is no reason why we shouldn't be together as we have never had a serious quarrel."

To this letter the libelant made no reply and on December 5 the libelee again wrote enclosing a copy of her letter of November 21. Again the libelant did not reply but filed a suit for divorce in the State of Maryland alleging desertion. This suit was dismissed on the ground that the libelant had no sufficient residence in Maryland and the merits of the controversy were not considered.

The circuit judge found (and his finding is admittedly correct) that the libelee's letter of November 21, followed by another letter on December 5, constituted an unconditional and unequivocal offer by her, made in good faith, to resume her marital relations with the libelant and that the libelant refused her offer. He also found, however, that the libelant's letter of April 10 was an unconditional offer, made in good faith, to resume marital relations with the libelee and that the libelee's acceptance of this offer, contained in her letter of April 11, was a conditional and not an absolute acceptance and was therefore tantamount to a refusal and that she thus became the deserting party. He also found that her desertion had thereafter continued without interruption for more than six months prior to November 21, when her offer to return was made, and that the libelant's cause of action having then accrued he was under no legal duty to accept it. It was upon this finding the libelant was granted a divorce.

Assuming that the libelant's offer, contained in his letter of April 10, was unconditional and made in good faith I think the finding that the libelee's acceptance contained conditions which converted it into a refusal, thus making her, from that date, the defaulting party, was erroneous. The only provisions to her acceptance were the sincerity of her husband, suitable quarters and the kind of treatment due to a good wife. These were reasonable precautions for her to take. Moreover, both of the parties seem to have proceeded in their negotiations upon the assumption that the conditions would be complied with. The date of their reunion (May 1) was agreed upon. Plans were made accordingly. When the time arrived, however, the reunion did not occur. It was through no fault of the libelee that it failed. She was ready and willing but he was not. Even on his return on May 20 he wrote her a letter imposing additional delay. No wonder she

was shocked at his treatment of her. His conduct and his letters showed his indifference to her and left him in no position to claim that she was the deserting party. Then he wrote the letter of July 8 telling her "the home is waiting" and that "it is * * * up to you." If there was desertion on the part of the libelee at all, which I very much doubt, it did not begin before the receipt of this letter. Assuming that it did begin on that date the period between such date and November 21, or December 5, 1922 (these latter dates being the ones on which the libelee offered to resume marital relations with the libelant), was short of six months and therefore the libelant's cause of action against the libelee for divorce had not accrued. This being true, whatever desertion the libelee was guilty of was cured and the libelant, in order to himself escape the imputation of desertion, was obliged to accept her offer. This he did not do.

The question has arisen as to what disposition should therefore be made of the case. It is contended by the libelant that in the event of a reversal the case should be remanded to the lower court for a new trial. It is contended, on the other hand, by the libelee that in the event of a reversal this court should enter an order dismissing the libel or remand the case to the lower court with instructions to dismiss it. It is not contended by the libelant that he should be given a new trial on the issue of whether the libelee deserted him on April 10, 1922, or thereafter. He does claim, however, that it is not apparent that it would be impossible for him on a new trial to produce evidence which would show that the libelee deserted him prior to April 10 and that therefore under the rulings of this court in former cases he should be given an opportunity to produce such evidence if it exists.

Whatever might be the fate of this claim under different circumstances, I think in the instant case it cannot

be sustained. The letter of April 10, 1922, by the libelant to the libelee, and her reply, which was followed by a remittance by the libelant of money with which to ship her furniture to the place he had designated as their future residence and which he said would be ready for their occupancy on May 1, was a complete condonation by him of whatever prior desertion the libelee might have been guilty. This condonation precludes the libelant from predicating any action for divorce on such desertion.

In *Bush* v. *Bush*, 205 S. W. (Ark.) 895, the husband sued for a divorce on the ground of adultery. The adultery of the wife was proved. It appeared, however, that with knowledge of his wife's conduct terms of reconciliation were agreed upon in the presence of the wife's mother and it was also agreed that the parties would resume their marital relations and the husband so informed his father-in-law. Thereupon the husband and wife walked a distance of a few miles to the home they were to occupy but within ten or fifteen minutes after reaching there he informed her that he had decided that they could not get along together and took her back to her parents. In holding that the wife's fault was condoned the court said (p. 897) : "The conduct of the appellant, according to his own admission, contains all the elements necessary to constitute legal condonation of the alleged offense. It was voluntary and complete. It is true that he changed his mind and undertook to rescind his acts of forgiveness and reconciliation before the resumed relations with his wife had proceeded to the extent of actual cohabitation or sexual intercourse, but it is not essential that the relation should have proceeded to that extent in order to become complete and binding. There are two modes or forms of condonation, one express and the other implied; and, while there are some authorities that go to the extent of holding that an implied condonation is not completed with any act

806

short of actual cohabitation, we find none of the authorities that hold that an express condonation need go to that extent."

In *Thompson* v. *Thompson*, 247 Pac. (Nev.) 545, the wife had sued the husband for a divorce in the city of Washington, D. C. A decree was entered in her favor for separate maintenance. Thereafter the parties executed an agreement in writing wherein it was recited in substance that they would resume their marital relations. It was also recited that as an evidence of good faith on the part of the husband he had conveyed to the wife a certain house and lot in Washington. It was also agreed that the suit which the wife had brought and upon which she had obtained a decree of separate maintenance should be dismissed. Later (in 1921), in litigation between the parties instituted in Nevada, relating to a divorce, the question arose as to whether this agreement amounted to condonation. Speaking on this subject the court said (p. 546) : "We are clearly of the opinion that the entering into the agreement settling the Washington case was a condonation of all prior grievances. But it is contended by counsel that there can be no condonation where there is no cohabitation and that there was no cohabitation between the parties after the agreement was signed. While it is true, as contended, that there was no cohabitation, we are not in accord with the contention made. 'Condonation,' as that word is used in divorce suits, is merely a forgiveness by the aggrieved spouse of past offenses on the condition that they will not be repeated. Such forgiveness must be with the intention that the offender shall be restored to former marital relations. 19 C. J. 83. This forgiveness is generally established by the conduct of the party, but an express forgiveness may be shown, and, when shown, is as binding as one shown by proof of cohabitation. In *Beeby* v. *Beeby*, 1 Hagg. Ecc. 789, the

court, speaking through Lord Stowell, said, 'Now, condonation is forgiveness legally releasing the injury; it may be express or implied, as by the husband cohabiting with a delinquent wife, for it is to be presumed he would not take her to his bed again unless he had forgiven her.' Another English case wherein express condonation was held sufficient is that of *Blandford* v. *Blandford*, 8 Prob. Div. 19. In that case the wife had written letters expressing her forgiveness. The court said: 'But the letters show that she forgave him on condition that he "sinned no more," and that is the legal definition of condonation.' " The court in its opinion cited *Bush* v. *Bush, supra,* as a supporting authority.

The decree appealed from is reversed and the libel dismissed. A proper decree will be signed upon presentation.

*I. M. Stainback* (*Huber, Kemp & Stainback* on the briefs) for plaintiff in error.

*H. E. Stafford* (also on the briefs) for defendant in error.

CONCURRING OPINION OF PERRY, C. J.

I concur in the conclusion that there was not evidence sufficient to support the finding made by the trial judge that after April 10, 1922, the wife deserted the husband, within the meaning of the law, for a period of more than six months; and in the reasoning leading to that conclusion. I concur also in the conclusion that under the circumstances of this case a new trial cannot be granted and that a decree must be entered in favor of the libelee dismissing the libel; but I base my conclusion on this second point not upon the reason given in the leading opinion but upon another reason. The trial judge in his opinion said *inter alia:* "Wide latitude was allowed by the court in the taking of testimony. Evidence was ad-

mitted beginning with the date of marriage. Many letters were received in evidence on behalf of the libelee showing the condition and circumstances of the home life, the attitude of each to the other, and various and sundry incidents of the marriage relation. It appears from the evidence that the libelant was, on more than one occasion, desirous of securing a divorce and so stated in letters to the libelee. He also entered into an agreement, duly witnessed, that desiring to live a single life he was willing to pay to the libelee a certain sum monthly.

"Many of these letters were written four or five years prior to 1922. The letters and incidents of the period preceding 1922 show that the marriage relation was somewhat strained. Whatever may have been the causes for living separate and apart, and it is evident from the record that neither was desirous of resuming marital relations, yet it cannot be held that this situation is controlling when considered in the light of the incidents beginning with April, 1922." In other words, the trial judge, who saw and heard the witnesses and had the power to pass upon issues of fact, definitely found that the separations of the parties prior to April 10, 1922, were by mutual consent. When a separation is by mutual consent it does not constitute legal desertion on the part of either of the parties. There was ample evidence to support this finding. Several letters passing from the husband to the wife in 1921 and the written agreement, signed by the husband in 1920, which, as stated by the trial judge, witnessed that the husband desired "to live a single life," support the finding.

The situation, then, is that the finding made by the judge of a desertion by the wife subsequent to April 10, 1922, is wholly unsupported by the evidence and that the finding which he made of an absence of desertion prior to April, 1922, is amply supported by the evidence. The

case does not stand as though the husband had not had an opportunity to present evidence on the question of desertion prior to April, 1922. Both parties have had their day in court. The judge has made his findings. One of those findings is set aside for lack of evidence; the other is held good. The result, to my mind, must necessarily be that a decree should be entered dismissing the libel. No request is made that the husband be given a second opportunity to present evidence of desertion of the wife after April 10, 1922, and it could not be properly granted if it were made. The same is true of the request to present further evidence concerning the alleged desertion prior to April, 1922. Ordinarily, parties are not entitled to two attempts to prove their case. If they have had one opportunity and have presented their evidence and the evidence has been properly weighed and passed upon by the trial judge, that is all that they are entitled to. If no finding had been made by the court below on the issue that is earlier in point of time, the case might conceivably be different.

Upon this ground, I think that a decree should be entered in this court dismissing the libel.

### OPINION OF PARSONS, J., CONCURRING IN PART AND DISSENTING IN PART.

I concur with the majority in the opinion that the trial judge committed reversible error (a) in holding that a period of desertion began April 11, 1922, when the offer to return made by the libelant to the libelee was accepted only upon condition which was in effect no acceptance and (b) in holding that on November 21, 1922, when the libelee wrote to the libelant definitely offering to return to him, a full six months' period of desertion from and after April 11, 1922, had been completed. Libelant's letter of April 10 did not offer libelee a home

prior to May 1; and before May 1 had arrived libelant had informed libelee that he would not be ready for her for at least two weeks, which time was still further extended by reason of libelant's absence in Panama. The next letter to her was dated May 20, 1922. It called for further delay. It directed the shipment of their furniture and suggested that the libelee stay at a hotel until receipt of a message from the libelant telling her that she might come to him. In an earlier letter to the libelee libelant had said, "It takes a week to ten days for a shipment of this kind to come through." Therefore, in the circumstances recited, the wife's failure to come to her husband in Edgewood could not of itself have amounted to desertion until at least a week after her receipt of his letter of May 20, and she would have been justified in waiting for a further message telling her that she might come. Because of these errors of the trial judge, which are sufficiently presented by assignments, I concur with the majority in so far as it holds that the decree appealed from should be reversed.

I do not, however, concur in the view that a final decree dismissing the libel should be entered in this court. In my opinion the case should be remanded for a new trial.

As above set forth, the theory upon which the trial judge decided the case in favor of the libelant is untenable. It is untenable in holding, from the facts stated, that a six months' desertion period began April 11, 1922. It is probably untenable in concluding from said premises that before November 21, 1922, a right of action had accrued to the libelant which rendered the libelee's offer of that date to return ineffective as a defense—such conclusion being based upon the theory that the Hawaiian divorce statutes as to a six months' desertion period were applicable notwithstanding the fact that the libelant was

not then domiciled in Hawaii. An opinion upon this latter point has not been deemed essential to a determination of the case. Upon the theory adopted by the trial judge I concede that it appears that a new trial could not benefit the libelant. But the theory adopted by the trial judge was not the only one presented by the pleadings and the proof. Under the pleadings the libelant could have shown that a desertion period began long prior to April 11, 1922, and the record before us contains evidence which in part at least supports this last named theory. In 1914 the libelant left New York to take a position as traveling salesman with headquarters in Cincinnati, where the libelee visited him during one, or, according to her testimony, during two summers. Libelant remained in Cincinnati during the years 1915, 1916 and part of the year 1917. His testimony, contradicted by libelee, is that he wanted libelee to come and live with him in Cincinnati and discussed the subject with her during the holidays of 1915-1916. She did not come, but remained with her two sisters in New York, libelant remitting amounts to cover her household and other expenses. In 1917 libelant went to Washington, D. C., and in November of that year was commissioned a captain in the national army, being stationed first at Washington and later at Edgewood Arsenal, Maryland, not far from Baltimore. During the years 1918 and 1919 libelant visited libelee occasionally in New York, spent a short time on sick leave with her in Maine and was with her on the occasion of visits to her brothers' homes in Baltimore. According to libelant's testimony, libelee did not want him to stay in the army and requested him to give up the army and to come back to live in New York. This the libelee denies. In September, 1919, libelant visited libelee in New York. At that time a quarrel ensued between them because of a misunderstanding over an invitation to a

wedding reception which was addressed to the libelant which did not include the libelee and which the libelant therefore did not accept. Said the libelant in his testimony: "It started quite a serious and heated argument which was entered into by other members of the family. The result was I packed my bag and went to the train and back to Washington. At that time I wanted her to come to Washington with me and give up New York because we were getting nowhere." Thereafter libelant continued to send checks as he had done theretofore to cover bills sent him by the libelee, with an additional allowance of $30 per month for incidentals, but in other respects there were for several months no further communications between the parties. The transcript shows no further cohabitation between them after September, 1919.

It is true that the following year libelant, under circumstances which need not here be recited, signed the statement of January 7 referred to in the leading opinion, and it is also true that in 1921 libelant desired a divorce and so informed the libelee in letters quoted in part in that opinion; but these facts do not necessarily preclude proof of desertion on the part of the wife, begun at least as early as 1919. Where a plaintiff is not entitled to recover on a theory on which the case is tried, but there is another theory on which a verdict for the plaintiff under the facts could be sustained, the judgment will be reversed and the cause remanded for a new trial; and this has been held to be true even though it requires an amendment of the petition to include such other theory. See *Woodson* v. *Metropolitan Street Railway Co.*, 224 Mo. 685, 20 Ann. Cs. 1039, 30 L. R. A. (N. S.) 931; and 2 R. C. L., Sec. 240, p. 286, note 12.

The trial judge made no direct finding of facts upon which could be predicated a conclusion that there was or that there was not a desertion of the husband by the

wife in 1919, and in my opinion his decision assumes no such finding. He said in part, "Whatever may have been the causes for living separate and apart, and it is evident from the record that neither was desirous of resuming marital relations, yet it cannot be held that this situation is controlling when considered in the light of the incidents beginning with April, 1922." The judge's extensive review of the evidence begins, after a brief introduction, with the libelant's letter of April 10, 1922, and goes into detail as to the events which succeeded that date. It does not attempt to weigh the evidence as to grounds for divorce existing before that date. If it assumes, as the majority holds that it does, that prior to April 10, 1922, the parties were living separate and apart by mutual consent, it bears internal evidence that the trial judge did not intend to find, and did not find, that the separation started that way. Referring to the libelee, he said, "Had she cared sufficiently for the libelant and for his career she would have followed him to whatever posts he was assigned. Apparently, however, she desired more to live with her relatives in New York and was willing to sacrifice a home with her husband in order to be with them. No doubt that as long as he continued to remit funds to her she would have been content to continue living separate and apart from him. It was her duty to live with him and when she wilfully persisted in remaining away from the home he was ready to provide for her, then he was justified in seeking to sever the marriage ties."

The trial court made no direct finding or conclusion (1) as to whether the separation of the parties in the first instance was due (a) to the fault of the libelant, (b) to the fault of the libelee, or (c) to mutual consent of the parties; (2) as to the domicile of the libelant, or the period of the same in any one jurisdiction, during the time of the separation of the parties prior to the libelant's

assignment to duty in Hawaii; (3) as to whether or not a right of action against the libelee for desertion had accrued and was available to the libelant on or before November 21, 1922, in the place where he was then domiciled.

The facts above referred to are all material and many of them are essential. By analogy the case of *Barnes* v. *Williams*, 11 Wheat. (24 U. S.) 414, applies in part. The syllabus is as follows: "Where, in a special verdict, the essential facts are not distinctly found by the jury, although there is sufficient evidence to establish them, this court will not render a judgment upon such an imperfect special verdict, but will remand the cause to the court below, with directions to award a *venire facias de novo.*"

But even if the trial judge had made distinct findings of fact against the libelant upon the theory of the case hereinabove last referred to, such findings alone would not be determinative of the question as to whether or not the case should be remanded for a new trial. Upon hearing on writ of error *In Re Nelson,* 26 Haw. 809, 822, this court said: "Upon the evidence adduced the judgment under review cannot stand. As to whether judgment for the petitioner should now be entered by this court (or directed to be entered in the court below) or the cause be remanded for a new trial, it has been held in this jurisdiction that 'if the court is of the opinion that other evidence may be produced on a new trial or is unable to say that such evidence may not be produced, it will not render final judgment but will remand the case for a new trial' and that 'before an appellate court can render final judgment on the reversal of a judgment for insufficiency of the evidence it is not enough that it appears improbable that the appellee will be able to recover on a new trial, but it must appear that he cannot'" (citing *Territory* v.

*Howell,* 25 Haw. 320, 325, 326; 2 R. C. L. 282, Sec. 237; and 4 C. J., pp. 1185-1188). The same principle was recognized in *Orth* v. *Basker,* when, on October 8, 1928, by oral order not reported in the published opinions, this court overruled a motion to modify the order granting a new trial reported in 30 Haw. 520, 525.

The evidence of the libelant as to his domicile and right of action in 1922 and his subsequent right of action in Hawaii, based thereon, may have been incomplete, but it does not appear to me to be impossible or even improbable that other evidence entitling libelant to a decree may be produced upon a new trial.

It is said in the leading opinion that the evidence at the hearing showed condonation by the husband of any desertion of which the wife may have been guilty prior to April 10, 1922. And the facts relied upon to show such condonation were the written communications between the parties at and after that date "followed by a remittance by the libelant of money with which to ship her furniture to the place he had designated as their future residence and which he said would be ready for their occupancy on May 1." "This condonation," it is said, "precludes the libelant from predicating any action for divorce on such desertion" and thus shows that a new trial on the issue of the wife's desertion prior to April 10, 1922, could not avail the libelant. But condonation is a mixed question of law and fact (see 2 Bishop, Marriage and Divorce, 6th Ed., p. 59) and from the facts set forth in the leading opinion there is no irrebuttable presumption of condonation. A mere offer of reconciliation does not amount to condonation (*Johns* v. *Johns,* 29 Ga. 718; *Goeger* v. *Goeger,* 59 N. J. Eq. 15, 45 Atl. 349) and until accepted it may be withdrawn like any other offer. (2 Bishop, Marriage and Divorce, 6th Ed., p. 40.) In the case at bar the trial judge found that libelant's offer of

April 10, 1922, was not definitely accepted by the libelee until November 21, 1922, and in my opinion the finding was supported by the evidence. In the meantime, according to the conclusion of the trial judge, a right of action had accrued to the libelant, which fact made the acceptance ineffective to defeat libelant's right of action. The majority has held, and I have concurred in the ruling, that the trial judge's conclusion was erroneous as applied to the theory upon which he decided the case. But it does not follow therefrom that such a conclusion would not have been justified upon the theory of a desertion begun in September, 1919.

The justice of the case seems to me to demand that the libelant be afforded an opportunity of a direct submission and ruling upon all the issues involved and of adducing further proof in support of his libel.